NO. 93-253

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

LINDA NEWMAN MILLER

    Petitioner and Appellant,

-v-

MAURINE FRASURE, d/b/a O'HAIRE
MOTOR INN RESTAURANT, Employer,
and WESTERN GUARANTY FUND SERVICES

    Defendant and Respondent.

FILED

MAR 22 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    Workers' Compensation Court
                State of Montana
                The Honorable Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            William O. Bronson, James, Gray & McCafferty, Great
            Falls, Montana

        For Respondent:

            K. Dale Schwanke, Jardine, Stephenson, Blewett &
            Weaver, Great Falls, Montana

                        Submitted on Briefs:  January 13, 1994

                                    Decided:  March 22, 1994

Filed:

_____
                      Clerk

Justice **James C. Nelson delivered the Opinion of the Court.**

This is an appeal, and a cross-appeal, from a Workers' Compensation Court, findings of fact, conclusions of law and order, in which the court ruled that petitioner Linda Newman Miller (Miller), was permanently partially disabled. We affirm in part, reverse in part and remand for calculation of the permanent partial disability rate.

We restate the issues on appeal and cross-appeal.

### ISSUES ON APPEAL

1. Did the Workers' Compensation Court err in concluding that Miller was not permanently totally disabled?

2. Did the Workers' Compensation Court err during its in camera inspection of the insurer's claims file, and following order, by failing to require disclosure of otherwise discoverable facts?

3. Did the Workers' Compensation Court err in failing to require the insurer's adjuster's deposition to take place in Montana?

### ISSUES ON CROSS-APPEAL

1. Did the Workers' Compensation Court err in concluding that Miller met her burden of proof that a causal relationship existed between her industrial accident and her disability?

2. Did the Workers' Compensation Court err in concluding that, if Miller is permanently partially disabled, she can elect whether she will seek benefits under § 39-71-703, MCA, or under § 39-71-705-708, MCA?

2

3. Did the Workers' Compensation Court err in sustaining Miller's objections to Frasure's deposition and the accompanying exhibit?

4. Did the Workers' Compensation Court err in denying the insurer's motion to reopen the trial?

Miller was 34 years old and working at the O'Haire Motor Inn Restaurant when she suffered an injury while at work on July 10, 1984. She slipped while mopping a floor and struck her right knee against the side of the bucket.

Since the accident, Miller has been to numerous physicians for a diagnosis of her knee problem, as well as relief from knee pain and swelling. These physicians have provided varying diagnoses for her condition, from chondromalacia patella of the right knee to reflex sympathetic dystrophy. It should be noted that Miller had suffered from both knee and hip problems before the date of the industrial accident.

Prior to the accident Miller was a high school graduate. After the accident she obtained a business degree from the Great Falls Vocational Technical Center, graduating in 1988. She has not sought paid employment since that time although she does volunteer at the YWCA as a receptionist/front desk clerk twice a week for a total of six hours per week. Miller has not made any attempt to obtain work, even on a part-time basis, since she started her volunteer position.

In addition to being the single parent of two children, Miller is a foster care parent for up to four children at a time. She

receives $360 per child per month for her work as a foster care parent. Miller also receives $334 per month in social security as well as $42.70 per child for her two children.

Miller's employer was enrolled under Compensation Plan # 2 of the Montana Workers' Compensation Act and was insured by InterMountain Insurance Company. InterMountain's obligations have since been assumed by Western Guaranty Fund Services (Western), based in Denver, Colorado.

The standard of review for findings of fact is whether there is substantial credible evidence to support the Workers' Compensation Court's findings of fact. Pepion v. Blackfeet Tribal Industries (1993), 257 Mont. 485, 489, 850 P.2d 299, 302. The standard of review for conclusions of law is whether the tribunal's interpretation of the law is correct. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603. The standard of abuse of discretion applies to trial administration issues. Steer, Inc., 803 P.2d at 603-04.

ISSUES ON APPEAL

1. PERMANENT TOTAL DISABILITY

Miller argues that the Workers' Compensation Court erred in concluding that she was not permanently totally disabled. The defendant/cross-appellant (Western) counter that there is substantial credible evidence supporting the Workers' Compensation Court's conclusion. Moreover, Western states that Miller did not carry her burden to introduce evidence about her normal labor market as required, but instead, provided evidence "related to jobs

4

she had held prior to her injury and vocational retraining - not to the types of work she is qualified for now having graduated from Vo-Tech."

Section 39-71-116(13), MCA (1983), states that:

"Permanent total disability" means a condition resulting from injury as defined in this chapter that results in the loss of actual earnings or earning capability that exists after the injured worker is as far restored as the permanent character of the injuries will permit and which results in the worker having no reasonable prospect of finding regular employment of any kind in the normal labor market. Disability shall be supported by a preponderance of medical evidence.

We have adopted the Workers' Compensation Court's approach to establishing the burdens of production and proof for the nonmedical elements of disability in establishing a permanent total disability. Metzger v. Chemetron Corp. (1984), 212 Mont 351, 355, 687 P.2d 1033, 1035. Metzger provides:

To establish the existence of no reasonable prospect of employment in the normal labor market, a claimant must introduce substantial credible evidence of (1) what jobs constitute his normal labor market, and (2) a complete inability to perform the employment and duties associated with those jobs because of his work-related injury. (Citation omitted.)

Metzger, 687 P.2d at 1035.

In the instant case, Miller did not present any vocational evidence concerning her normal labor market. Miller relied on her testimony that she could not perform any of the jobs she had in the past because of her physical limitations. We have concluded that that sort of testimony is sufficient to meet the claimant's burden of proof to establish the existence of no reasonable prospect of employment in the claimant's normal labor market. See, for

5

example, Varela v. Exxon, U.S.A., Billings Refinery (1989), 237 Mont. 300, 308-09, 773 P.2d 299, 304: Ness v. Anaconda Minerals Co. (1993), 257 Mont. 335, 339, 849 P.2d 1021, 1023-24. Once the claimant has demonstrated that there is no reasonable prospect of employment in his normal labor market, the burden then shifts to the employer to show that suitable work is available. Metzger, 687 P.2d at 1036.

Here, Western met its burden to establish that, by reason of Miller's post-injury education and training, there were other jobs for which she was suited by age, education, work experience and physical condition. Gerry Loch (Loch), a private rehabilitative counselor who worked with Miller in an attempt to facilitate her return to the work force, testified for Western and presented vocational evidence. She also developed job analyses after discussing Miller's post-injury education and training with her and after discussing Miller's medical condition with a physiatrist who treated Miller. Loch also considered that with Miller's training and education, she was in a _better_ earning position post-injury than she was in before she was injured and subsequently retrained, _if_ she could work on a full-time basis.

Western offered the deposition testimony of Dr. Hinde, the physiatrist Loch interviewed, who stated that "[t]o my evaluation and by her history, I would suspect that [Miller] would be able to function successfully at a sedentary work level or very well selected light work level." He also opined that "her sum total of demonstrated function in terms of volunteer capacity, homemaking

6

activity, child care activity, would constitute an equivalent to more hours than six hours per week of sedentary to well selected light work. To work out of the home would require child care to be arranged and perhaps someone else to assist with homemaking duties, but it certainly doesn't preclude work at a level of much higher than that." Dr. Hinde concluded that the job analyses compiled by Loch were positions which were medically appropriate for Miller although his recommendation was to gradually work Miller into full time employment. Dr. Hinde's conclusions were also supported by another physiatrist, Dr. Jackson, to whom Dr. Dietrich referred Miller.

To counter Western's evidence, Miller, for the most part, relied on her own testimony that she would not be able to perform the job duties associated with the analyses provided by Loch. She also offered the deposition testimony of Dr. Dietrich that unless there was some improvement in her physical condition, he would not approve of Miller working beyond the six hours per week she volunteers at the YWCA. The sum total of the evidence provided by Miller, coupled with her non-existent effort to obtain even part-time employment, does not carry her burden to prove an inability to find employment in her normal labor market. Metzger, 687 P.2d at 1036. Western, however, did carry its burden to show that suitable work was available for Miller, and that, therefore, she was not permanently totally disabled.

Miller also poses the argument that she may be an "odd lot" employee. However, Miller is not an "odd lot" employee due to her

7

sufficient training, education and experience and therefore, we reject her "odd lot" employee argument. Metzger 687 P.2d at 1036.

Moreover, Miller provided testimony about a variety of household chores she has engaged in which indicate an ability to work outside of the home in a paid position. In 1990, Miller bought a new home, which she cleaned when she moved in, vacuuming the carpets and "wash[ing] everything down." She also painted a couple of bedrooms and the kitchen. Additionally, she seeded, fertilized and watered the lawn as well as put in flower beds around the house. Moreover, Miller testified that she does the laundry and cooking for herself, her two biological children and up to 4 foster children. These many and varied activities indicate that Miller could be working outside of the home, at least on a part-time basis.

We therefore, conclude that there was substantial credible evidence to support the Workers' Compensation Court's judgment that Miller was not permanently totally disabled. "Even though conflicting evidence may exist in the record, it is the duty of the Workers' Compensation Court, and not this Court, to resolve such conflicts." (Emphasis added.) Pepion, 850 P.2d at 302. The Workers' Compensation Court had the opportunity to listen to the witnesses, assess their credibility and testimony, and it correctly concluded that substantial credible evidence supported a conclusion that Miller was not permanently totally disabled.

## 2. IN CAMERA INSPECTION

Miller contends that the Workers' Compensation Court's order

on disclosure of the insurer's claims file does not indicate whether certain documents not disclosed contained "factual information otherwise discoverable." Western states that Miller never asked the Workers' Compensation Court to indicate whether documents not ordered to be disclosed contained factual information otherwise discoverable so she should not be heard to complain at this time.

Miller's argument cannot prevail because she did not seek to have the insurer's claims file which was the subject of the Workers' Compensation Court's protective order of February 19, 1992, filed with this Court as a part of the record on appeal. We will not presume that the Workers' Compensation Court erred in the "in camera" inspection: without the file, there is no way for this Court to review the Workers' Compensation Court's decision to exclude some documents in the file from discovery and produce other documents. See Palmer by Diacon v. Farmers Ins. (1993), ___ Mont. ___, 861 P.2d 895, 906. It remains the appellant's obligation to insure the completeness and accuracy of the record on appeal and to take appropriate action to have included in the record all documents, discovery and evidence which relate to the errors claimed. Appellant may not predicate error on an incomplete record. In the instant case, it would have been appropriate to request the Workers' Compensation Court to seal the non-discoverable documents and to order those filed with the record on appeal. See, for example, State v. Little (1993), Mont. ___, 861 P.2d 154, 158.

9

Under the circumstances, we must affirm the Workers' Compensation Court's order prohibiting discovery of some documents in the insurer's claims file and allowing discovery of other documents from the file.

### 3.. DEPOSITION OF CLAIMS ADJUSTER

Finally, Miller complains that, pursuant to Rule 24.29.804, ARM, the claims adjuster in charge of Miller's case should have been ordered to be deposed in Montana inasmuch as Western is the insurer and inasmuch as Western does not maintain a resident adjuster in Montana, a requirement under Rule 24.29.804, ARM.

The Workers' Compensation Court concluded that Western was deemed an "insurer" within the meaning of § 33-10-105(1)(b), MCA, and that Western, through § 39-71-116(8), MCA, was subject to Rule 24.29.804, ARM. However, the court refused to compel the adjuster in charge of Miller's case to be deposed in Montana under the rationale that it could not enforce a subpoena across state lines, and, in so ruling, left Miller to complain to the Department of Labor if she felt the Rule was being violated. We agree that Western is subject to the Rule; we disagree that the adjuster cannot be compelled to attend his deposition in Montana.

Rule 24.29.804, ARM, provides:

ADJUSTERS IN MONTANA (1) Every insurer is required to designate at least one adjuster, maintaining an office in Montana, which shall pay compensation when due and which shall have authority to settle claims

A logical extension of this rule is that the adjuster, by virtue of his required presence in Montana, should then be available for a deposition in this State. Western is admittedly in violation of

10

this Rule in not having a resident adjuster in Montana.

Under § 39-71-203, MCA, the Workers' Compensation Court is vested with the power, authority and jurisdiction necessary to the exercise of its power to conduct proceedings and hearings and make determinations concerning disputes under Chapter 71. Moreover, Rule 24.5.326, ARM, provides the Workers' Compensation Court with the authority to compel the claims adjuster to be deposed in Montana by an order to compel responses. The statute and the rule provide the Workers' Compensation Court with the authority to order the insurer's claims adjuster to be deposed in Montana. The court's concern over its ability to enforce an out-of-state subpoena is not the issue. The adjuster represents a named party over which the court has jurisdiction; Western is the insurer and is obligated to conduct its business of insuring claimants and adjusting claims in accordance with applicable State laws and administrative regulations.

While it might be argued that this issue is moot because Miller, on the basis of the court's order, went ahead and deposed the adjuster in Colorado in preparation for trial, in view of the potential for this issue to recur in this and other cases, we hold that the statutes and rules aforementioned mandate that a non-resident claims adjuster can be compelled by the Workers' Compensation Court to be deposed in Montana, as a logical extension of the insurer's obligation to designate a resident adjuster under Rule 24.29.804, ARM. We reverse the decision of the Workers' Compensation Court on this issue.

11

ISSUES ON CROSS-APPEAL

1. CAUSAL RELATIONSHIP BETWEEN ACCIDENT AND DISABILITY

Western contends that Miller did not prove a causal relationship between the accident and the injury necessary to establish a permanent partial disability. Western bases its argument on two alleged errors by the Workers' Compensation Court.

A. Unsworn Medical Reports

Western argues that a finding of "permanent partial disability" requires a determination that the disability result from an injury. The Workers' Compensation Court's determination that Miller was permanently partially disabled was based upon its conclusion that Dr. Patterson and Dr. Popnoe relate Miller's disability to the accident at O'Haire's Motor Inn. Western states that Miller did not call either doctor to testify at trial or by deposition, and therefore, their testimony by written medical reports should be excluded. Miller argues that pursuant to Rule 24.5.317, ARM, the Workers' Compensation Court's reliance on the written medical reports was proper.

We agree that the Workers' Compensation Court's reliance on the written medical reports of Drs. Patterson and Popnoe was proper. Western bases its argument that the medical reports were improper on Hert v. J. J. Newberry Co. (1978), 178 Mont. 355, 584 P.2d 656 - Order on Petition for Rehearing (1978), 179 Mont. 160, 587 P.2d 11, wherein this Court determined that unsworn medical reports which were not exchanged before trial and whose authors were not available at trial, were not admissible in the proceeding.

12

The <u>Hert</u> Court based its decision primarily on its concern that the author of the medical report was not available for cross-examination. This concern was addressed and considered in 1990 by the adoption of Rule 24.5.317, ARM. Rule 24.5.317, ARM, provides:

<u>24.5.317 MEDICAL RECORDS</u> (1) Prior to any scheduled trial, the parties shall exchange all medical records based upon examination of the claimant. Failure to exchange any medical records, whether or not based on an examination, by the exchange deadline shall preclude its use at trial, except for good cause as set forth in subsection (4).

(2) Medical records based on an examination of the claimant and exchanged by the parties or their attorneys by the exchange deadline are admissible without the necessity of foundation testimony. A party may object to those reports being admitted into evidence and the objecting party will be allowed to depose or subpoena the author of any such records for purposes of cross-examination. An objecting party may subpoena the author for trial, or deposition before or subsequent to the trial as provided in ARM **24.5.322(1).**

(3) Subsection (2) applies only to admissibility. All other objections, such as relevance and materiality, are preserved and may be raised as in any other proceeding.

(4) Medical records exchanged after the exchange deadline may be admitted into evidence only if stipulated to by the parties, or by the laying of the proper foundation by the proponent of the record. Upon proper motion and for good cause shown, the court, in its discretion may permit a post trial deposition under this section.

Rule 24.5.31.7, ARM, states that medical records based on an examination of the claimant and exchanged between the parties are admissible without the necessity of foundation testimony. Subsection 2 of the Rule <u>affords</u> the opposing party <u>the opportunity to depose or subpoena the author</u> of medical records at issue for <u>the purposes of cross-examination</u> if there is any objection to the medical records. Thus, the rule acknowledges due process cross-examination concerns by providing an opportunity for opposing

13

parties to depose or subpoena the author of medical records, thereby addressing and disposing of our concern expressed in Hert.

The rule finds support in both Montana and federal case law. For instance, in Stevens v. Glacier Gen. Assur. Co. (1978), 176 Mont. 61, 575 P.2d 1326, this Court allowed the admission of unsworn medical reports, stating that "claimant had notice, well in advance of the hearing, that defendants would rely on the reports of claimant's treating physicians...[c]laimant had ample opportunity to cross-examine the doctors by way of pre-hearing deposition, or by calling them as witnesses at the hearing." Stevens, 575 P.2d at 1330.

In a United States Supreme Court case, Richardson v. Perales (1971), 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842, the issue was whether physicians' written medical reports of examinations of claimant may be considered "substantial evidence" to support a finding of non-disability in a social security hearing "when the claimant objects to the admissibility of those reports and when the only live testimony is presented by his side and is contrary to the reports." Richardson, 402 U.S. at 390. The Court concluded that:

> [A] written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination of the physician.

Richardson, 402 U.S. at 402. Some of the Court's reasons for

14

concluding that the evidence was admissible include the following:

1. The reports were prepared by practicing physicians who had examined Perales.
2. Perales could have, but did not, take advantage of the opportunity to cross-examine the reporting physicians under 20 CFR § 404.926.
3. "Courts have recognized the reliability and probative worth of written medical reports even in formal trials and, while acknowledging their hearsay character, have admitted them as an exception to the hearsay rule." Richardson, 402 U.S. at 405.
4. The probative value of these reports had been recognized in social security disability hearings in the past.
5. "[T]he cost of providing live medical testimony at those hearings, where need has not been demonstrated by a request for a subpoena, over and above the cost of the examinations requested by hearing examiners, would be a substantial drain on the trust fund and on the energy of physicians already in short supply." Richardson, 402 U.S. at 406.

These same considerations are inherent in the adoption of the Workers' Compensation Court's rule allowing for the admissibility of medical reports. We hold that under Rule 24.5.317, ARM, the written medical reports of Drs. Patterson and Popnoe were properly relied upon by the Workers' Compensation Court judge in his decision. Further, because of the adoption of Rule 24.5.317, ARM, Hert is no longer authority for the admissibility of medical records.

B. Written Statements as Sufficient to Find Disability

Western argues that even if the written medical statements were admissible, they did not amount to a preponderance of the evidence to establish a causal relationship between the accident and the injury. Miller counters that case law supports the Workers' Compensation Court's conclusion that Miller has a permanent partial disability because her industrial accident

15

aggravated a preexisting condition. We agree.

The aggravation of a preexisting condition is compensable. Rumsey v. Cardinal Petroleum (1975), 166 Mont. 17, 28, 530 P.2d 433, 439. Miller argues that "proof that it was medically possible for an industrial accident to aggravate a pre-existing condition is acceptable proof of disability," citing Viets v. Sweet Grass County (1978), 178 Mont. 337, 340, 583 P.2d 1070, 1072; Strandberg v. Reber Co. (1978), 179 Mont. 173, 176, 587 P.2d 18, 20. (Emphasis added.) The Viets Court stated that while claimants must prove by a preponderance of the evidence that the injury suffered arose out of and in the course of their employment, "evidence of what is medically possible is more reliable in proving aggravation of an injury or disease [rather] than cause and effect." Viets, 583 P.2d at 1072. Therefore, according to Miller, under the law applicable at the time of injury, evidence of the possibility of an aggravation of an injury is acceptable even though the nexus between actual injury and disability must be proved by a preponderance of the evidence.'

Western maintains that proof of medical possibility alone is insufficient to meet the claimant's burden of proof, citing Ferdinand v. Lodge #456, B.P.O.E., Lewistown (1986), 221Mont. 436,

---

¹ We are obligated to apply the substantive law in effect at the time of the claimant's injury. Buckman v. Mont. Deaconess Hosp. (1986), 224 Mont. 318, 730 P.2d 380. Under the law since 1987, proof that it was medically possible that a claimed injury aggravated a preexisting condition is not sufficient to establish liability. See Ch. 464, L. 1987, § 39-71-407(2)(b)(1993), MCA, Plainbull v. Transamerica Insurance Company, Cause No. 93-432; and Prillaman v. Community Medical Center, Cause No. 93-283.

16

719 P.2d 775, and that there must be evidence offered in addition to and supportive of the medical possibility of aggravation of the preexisting condition.

As pointed out by Western, the <u>Viets</u> approach was modified by other cases: proof that it was medically possible for an industrial accident to aggravate a preexisting condition is acceptable proof of a disability <u>but it must be supported by other independent evidence.</u>  <u>See</u> Currey v. 10 Minute Lube (1987), 226 Mont. 445, 736 P.2d 113 (injury occurred in 1984).   The <u>Currey</u> Court, citing Wheeler v. Carlson Transport (1985), 217 Mont. 254, 261, 704 P.2d 49, 53-54, stated:

> "Medical possibility" is to be weighed just as any other evidence; if supported by other, independent evidence it is "acceptable" to be used by the court in making its determination.  Medical possibility evidence by itself, though, does not mandate the conclusion that the claimant has met his burden of proof under the Act.

While the 1987 legislature statutorily modified claimants' burden of proof for the occurrence of injury and aggravation of a preexisting condition, we conclude that claimant's burden of proof in this case is best explained by the approach suggested by Western -- i.e. proof of medical possibility supported by other independent evidence.

Miller provided a letter from Dr. Popnoe, stating that he saw Miller on March 19, 1985, and after an examination diagnosed her condition as "[c]hondromalacia of the right patella secondary to possibly (sic) injury as well as a result of patellar malalignment in the past."   Additionally, Dr. Patterson opined that "the original injury to her knee and possibly to associated cutaneous

17

nerves is the source of her condition."

Miller also points out to the court that Dr. Losee's examination and his follow-up report add support to Drs. Patterson's and Popnoe's opinions that the injury caused the disability. Dr. Losee stated that it was his impression that she irritated the infrapatellar branch of the saphenous nerve of the right knee when she hit her knee against the bucket.

In addition, Dr. Avery testified to the following in his deposition:

> Q. I apologize if I wasn't clear. What I was referring to principally was the fact that prior to this incident, that she states occurred in July of 1984, she had some problems with her knee, at an earlier period of time. And these problems had had some type of surgical procedure performed to resolve that problem?
>
> A. Correct.
>
> Q. I also understand it was your testimony that you felt that the incident that she related, that occurred on July 10, 1984, had aggravated these pre-existing problems, is that correct?
>
> A. That's correct.

Under the modified Viets approach, we conclude that there was sufficient evidence to prove that Miller had a preexisting medical condition which was aggravated by her July 10, 1984 injury. The letters from Drs. Popnoe and Patterson establish the possibility that the injury aggravated the existing knee problems. This evidence is supported by independent evidence of Drs. Losee and Avery, which establishes, under the Currey standard, that Miller has met her burden to prove her case by the preponderance of the evidence. "[W]here the findings are based on conflicting evidence,

18

this Court's function on review is confined to determining whether there is substantial evidence to support the findings and not to determine whether there is sufficient evidence to support contrary findings." Little v. Structural Systems (1980), 188 Mont. 482, 486, 614 P.2d 516, 519. Although the evidence here is not overwhelming and is certainly conflicting, we conclude that substantial evidence does support the Workers' Compensation Court's determination. We hold that the Workers' Compensation Court did not err in determining that Miller had a permanent partial disability.

## 2. ELECTION OF REMEDIES

Western argues that Miller should have elected to claim benefits under § 39-71-703, MCA, or by applying §§ 39-71-705 through 708, MCA, but she did not make that election and did not present evidence at trial from which the Workers' Compensation Court judge could determine the amount of benefits to which she was entitled. Miller counters that the argument that she was permanently partially disabled was an alternative position and that the determination of the level of benefits could properly be postponed until a later date.

Pursuant to § 39-71-2905, MCA, the Workers' Compensation Court judge has exclusive jurisdiction to make determinations concerning disputes and is required to fix and determine benefits due to claimants who successfully prove a disability. In its findings of fact, conclusions of law, and order, the Workers' Compensation Court stated that it had some of the data necessary to determine

19

the appropriate award for Miller but that it was currently unable to determine the actual rate. It further requested information that would bring Miller's 1984 wages current to the time of the trial.

The Workers' Compensation Court's authority to fix and determine benefits extends to the authority to determine the time and manner in which it shall determine those benefits. The court has chosen a suitable process for determining Miller's benefits in the present case. The determination of Miller's permanent partial disability benefits is a strictly formulaic procedure which can be easily and quickly accomplished with the admission of numerical evidence. Because the Workers' Compensation Court does not have all the necessary evidence to determine Miller's benefits at this **time**, the appropriate recourse is to remand the case to the Workers' Compensation Court for a determination of Miller's permanent partial disability rate. We, therefore, remand this issue to the Workers' Compensation Court for further proceedings.

### 3. FRASURE DEPOSITION

Western argues that the Workers' Compensation Court improperly granted Miller's motion to strike Maurine Frasure's rebuttal deposition. (Frasure is the former owner/operator of the O'Haire Motor Inn, Miller's employer at the time of the accident.) Western contends that the Voluntary Quit Statement filled out by Miller and offered by Western as an exhibit to Frasure's deposition, was new evidence the Workers' Compensation Court should have considered. Moreover, argues Western, that exhibit was an exhibit counsel was

20

not even aware existed until the taking of the rebuttal deposition on October 19, 1992. Miller contests Western's argument, stating that the actual purpose of the Frasure rebuttal deposition was to challenge testimony from Miller's case-in-chief.

During the taking of **Frasure's** deposition, Miller's attorney objected to the majority of the testimony elicited on the grounds that it properly should have been produced in Western's **case-in-chief**. We agree. The testimony presented concerned Miller's injury and her attempt to return to the work force. This information could have been or should have been elicited during Western's case-in-chief.

Rebuttal testimony is confined to matters which tend to counteract new matters offered by the opposing party. Gustafson v. Northern Pacific Railway Company **(1960),** 137 Mont. 154, 164, 351 **P.2d** 212, 217. The matters delved into here include the relationship between the accident and Miller's physical condition, her credibility, and her ability to work after Dr. Avery released her back to the work force. These are some of the main issues raised during the trial and should have been adequately explored during Western's case-in-chief. See **Massman** v. City of Helena **(1989),** 237 Mont. 234, 243, 773 **P.2d** 1206, 1211-12. Western was given its chance to examine these issues during trial and should have discovered this information during pretrial investigation and preparation. The testimony and exhibits were not properly rebuttal testimony and therefore, we hold that the Workers' Compensation Court properly exercised its discretion in striking and excluding

21

the testimony and accompanying exhibit.

### 4. MOTION TO REOPEN THE TRIAL

Western asserts that the Workers' Compensation Court improperly denied its motion to reopen the trial. to admit evidence of the Voluntary Quit Statement offered as an exhibit to Maurine Frasure's deposition. Miller counters that the motion was untimely and the Workers' Compensation Court properly exercised its discretion in refusing to grant the motion. We agree with Miller's assessment and with that of the Workers' Compensation Court. Frasure's rebuttal deposition was taken on October 19, 1992. The motion to reopen the case, filed in order to present the Voluntary Quit Statement, was not filed until December 18, 1992, almost two months later.

The Workers' Compensation Court, in its denial of Western's motion, commented that Western should have been in contact with Frasure during its preparation for trial and the evidence at issue should have come to light at that time. Even if Western did not obtain evidence of the Voluntary Quit Statement until Frasure's deposition on October 19, 1992, it should have made arrangements at that point to obtain the full document from Frasure as soon as possible.

Pursuant to Rule 24.5.316(4), ARM, the Workers' Compensation Court has discretion to reopen a case and allow additional evidence. In the instant case, the Workers' Compensation Court had sound reasons for refusing to allow additional evidence in the case, and we do not find any abuse in the exercise of its

22

discretion. Western had ample opportunity to obtain the evidence necessary to defend its case but it did not avail itself of the opportunity in a timely manner. We conclude that the Workers' Compensation Court correctly denied the motion to reopen the case to admit the Voluntary Quit Statement.

Affirmed in part; reversed in part: and remanded for calculation of the permanent partial disability rate.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

23

March 22, 1994

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

William 0. Bronson, Esq.
James, Gray & McCafferty
P.O. Box 2885
Great Falls, MT 59403-2885

K. Dale Schwanke
Jardine, Stephenson, Blewett & Weaver
P.O. Box 2269
Great Falls, MT 59403

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:＿＿＿＿＿＿＿＿＿
Deputy